**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ADVANCED DERMATOLOGY, on behalf of itself and all those similarly situated, | ) ) ) ) | |
| v. | ) ) | Nos. 19 C 08012, 19 C 05821 |
| FIELDWORK, INC., | ) ) | Judge John J. Tharp, Jr. |
| and | ) ) | |
| DIXIE PLUMBING SPECIALITIES, INC., a Georgia corporation, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) ) | |
| v. | ) ) | |
| FIELDWORK CHICAGO-SCHAUMBURG, INC., FIELDWORK CHICAGO, INC., and FIELDWORK CHICAGO DOWNTOWN, INC., Illinois corporations, and FIELDWORK, INC., a Delaware Corporation. | ) ) ) ) ) ) | |

## MEMORANDUM OPINION AND ORDER

In 2019, plaintiffs Dixie Plumbing Specialties, Inc. and Advanced Dermatology each received an unwanted fax from defendant Fieldwork, Inc., a market research firm, apprising them of a paid opportunity to participate in an industry-specific research study. Dixie Plumbing Specialties and Advanced Dermatology now bring separate putative class actions under the Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227. The Fieldwork entities have filed motions to dismiss in each case; alternatively, Fieldwork moves to stay the proceedings pursuant to the primary jurisdiction doctrine and to strike the plaintiffs' class allegations.

Dixie Plumbing Services has plausibly pleaded that the fax it received from Fieldwork was a pretext for further advertising, so this Court cannot conclude that the fax Dixie Plumbing received was not an "unsolicited advertisement" under the TCPA as a matter of law, and Fieldwork's motion to dismiss Dixie's complaint is denied. Advanced Dermatology, however, expressly disclaimed the pretext theory and argued solely that the fax it received was, on its face, an unsolicited advertisement. This argument fails as a matter of law. So, though the faxes Fieldwork sent Advanced Dermatology and Dixie Plumbing are substantially the same, Fieldwork's motion to dismiss Advanced Dermatology's complaint is granted, given the plaintiff's waiver of the pretext argument.

Fieldwork's other motions to strike Dixie Plumbing's class allegations and to stay or dismiss the proceedings are also denied. Because Fieldwork has not established that Dixie Plumbing is categorically unable to satisfy Rule 23's criteria for class certification, even if given the opportunity to engage in class certification discovery, Fieldwork's motion to dismiss for failure to strike Dixie's class allegations is denied. And because the primary jurisdiction doctrine does not negate this Court's subject matter jurisdiction over Dixie's TCPA claims, and because there is unlikely to be a timely resolution to the pending FCC petition regarding the TCPA's definition of "unsolicited advertisement," Fieldwork's motion to stay or dismiss pursuant to the primary jurisdiction doctrine is denied as well.

## BACKGROUND

On May 22, 2019, plaintiff Dixie Plumbing Specialties, Inc. received a fax from Fieldwork, a national market research firm, inviting Dixie to participate in a research study with residential plumbers and share its opinion about brands and products it uses in its line of work. Dixie Compl. ¶¶ 14, 15, ECF No. 1 (19 C 05281). The fax indicated that Dixie would be compensated $200 if it qualified and participated in the five-day online study and provided a phone number to call if

interested.[1] *Id.* at ¶ 17; Ex. A. On July 23, 2019, plaintiff Advanced Dermatology received a nearly

identical fax;[2] the invitation it received offered $425 if Advanced Dermatology completed a

---

[1] The fax was on letterhead bearing Fieldwork's logo, the logo of Fieldwork's National Recruiting Center, and Fieldwork's address, telephone number, and email address. Dixie Compl. Ex. A. The signature block included Fieldwork's web address (www.fieldwork.com) and the same phone number. Id. Fieldwork's privacy policy, a brief overview of market research, and a disclaimer that voluntary participation in paid market research constitutes an independent contractor relationship with Fieldwork was included at the bottom, along with two URLs for fax recipients who wanted to learn more about the market research process. Id. The body of the fax read as follows:

> I'm contacting you from Fieldwork a national market research firm interested in obtaining your opinions for an upcoming research study. We are conducting a research study with **RESIDENTIAL PLUMBERS** regarding your opinions **about the brands and products you purchase.**
>
> We'd like to speak with you to see if you meet the qualifications for this study which will take place from **May 27th – May 31st via mobile app.**
>
> If you qualify and participate, you will be compensated **$200** after completing **5-days** of online activities via mobile app you will be asked to download to your smartphone. I can assure you, we are not selling anything and we are only interested in your opinions regarding your professional experiences with the brands and products you use.
>
> Please keep in mind that we have limited availability and would like to speak to you at your earliest convenience to ask you a few questions. If you are interested in participating, please call **Rebecca or Roy** at **1-888-863-4353** to see if you qualify for this study.
>
> We ask that you give consideration to participating in this market research as it is your chance to give input into the development of new products and ideas. We look forward to hearing from you soon as limited spots are available.

[2] The fax that Advanced Dermatology received was on the same letterhead and contained the same privacy policy and other additional information as the fax that Dixie received. Advanced Dermatology Compl. Ex. 1. The body of the fax read:

twenty-minute "homework assignment" and a ninety-minute online discussion with other dermatologist practice owners regarding the dermatology industry. Advanced Dermatology Compl. ¶ 8; Ex. 1.

Both plaintiffs now bring putative class actions alleging that Fieldwork has violated 47 U.S.C. § 227(b)(1)(C).[3] That statute prohibits the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement"

---

> I'm contacting you from Fieldwork, a national market research firm. I can assure you, we are not selling anything and we are only interested in your opinions as a **dermatologist-practice owner.**
>
> We are interested in speaking to individuals like yourself, to gain a better understanding and get feedback regarding about **the dermatology industry.** The findings will only be used for research purposes and all the findings will be anonymized and not linked back to you.
>
> We'd like to speak with you to see if you meet the qualifications for this study which will take place various times from **August 5th – August 7th.**
>
> If you qualify and participate, you will be compensated **$425** after completing a short 20-minute homework assignment, and a 90-minute discussion conducted by a professional moderator on an online platform.
>
> Please keep in mind that we have limited availability and would like to speak to you at your earliest convenience to ask you a few questions. If you are interested in participating, please call **Dominque or Dominic** at **1-888-863-4353**. Our call center hours are Mon-Thurs 9am-9pm Central and Fri-Sat 9am-3pm Central.

[3] Advanced Dermatology originally filed its complaint in the Northern District of Ohio on August 12, 2021. Dixie filed its complaint in this District on August 29, 2019. After the Dixie case was filed, Fieldwork filed an unopposed motion to transfer the Advanced Dermatology case to this District, which was granted. Following transfer of the Advanced Dermatology case, Fieldwork moved to consolidate the two cases for all pretrial proceedings, including resolution of the pending motions to dismiss, motions to strike, and motions to stay. Fieldwork subsequently withdrew its motion to consolidate as premature, however, so these cases are proceeding independently at present.

unless the fax recipient has an established business relationship with the sender, the recipient has voluntarily made its fax number available through different methods, and the advertisement has an adequate opt-out notice. Advanced Dermatology and Dixie seek injunctive relief and an award of statutory damages on behalf of themselves and similarly situated fax recipients. Fieldwork, however, has moved to dismiss, alleging that the faxes at issue do not constitute "unsolicited advertisements" as a matter of law; alternatively, it moves to strike the plaintiffs' class allegations and to dismiss or stay each case pursuant to the primary jurisdiction doctrine.

## DISCUSSION

Fieldwork moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6), moved to strike the plaintiffs' class allegations under Rule 12(f) and Rule 23, and moved to dismiss or stay pursuant to the primary jurisdiction doctrine under the Court's inherent equitable power. *See* Def.'s Mot. Dismiss or Strike Class Allegations, ECF No. 16, Def.'s Mot. Dismiss or Stay, ECF No. 17 (19 C 05821); Def.'s Mot. Dismiss or Strike Class Allegations, ECF No. 9, Def.'s Mot. Dismiss or Stay, ECF No. 11 (19 C 08012). Those arguments are taken in turn.

### A. Motion to Dismiss for Failure to State a Claim.

First, Fieldwork has moved to dismiss both complaints for failure to state a claim under the TCPA—it argues that the faxes it sent to Dixie and Advanced Dermatology are not, as a matter of law, "unsolicited advertisements" prohibited by the statute. *See* Def.'s Mot. Dismiss (Advanced Dermatology), at 4-7; Def.'s Mot. Dismiss (Dixie), at 4-8. A Rule 12(b)(6) motion tests the sufficiency of a plaintiff's claim; it requires the court to assess whether a litigant has "state[d] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bhalerao v. Ill. Dep't of Fin & Prof'l Regulations*, No. 11 C 7558, 2012 WL 5560887, at *2 (N.D. Ill. Nov. 15, 2012) ("A motion to dismiss pursuant to 12(b)(6) tests the sufficiency of the complaint, not the merits of the case."). At this early stage of the proceedings, the Court must accept as true well-

pleaded facts and draw reasonable inferences in favor of the plaintiffs. *See Ezekial v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).

In enacting the TCPA, "Congress' primary purpose . . . was to prevent the shifting of advertising costs to recipients of unsolicited fax advertisements." *Phillips Randolph Enters., LLC v. Adler-Weiner Research Chicago, Inc.*, 526 F. Supp. 2d 851, 852 (N.D. Ill. 2007). As a result, the TCPA prohibits the use of "telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" to recipients within the United States. 47 U.S.C. § 227(b)(1)(C). And the statute defines an "unsolicited advertisement" broadly, to include "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* at § 227(a)(5). Because "the TCPA is a remedial statute," courts "must liberally construe [it] in favor of consumer protection." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 967 (7th Cir. 2020).

The sole issue is whether Fieldwork's faxes meet the statutory definition of an "unsolicited advertisement." In Fieldwork's view, the faxes sent to Advanced Dermatology and Dixie Plumbing are not advertisements as a matter of law—by their plain language, Fieldwork argues, the faxes sought only to invite certain qualified dermatology practice owners and residential plumbers to participate in a research study pertaining to their respective industries. *See* Def.'s Mot. Dismiss (Dixie), at 1-2; Def.'s Mot. Dismiss (Advanced Dermatology), at 5-7. Fieldwork acknowledges that it benefits financially from the use of the information obtained through fax recipients' participation in its market surveys but maintains that the mere "potential to gain some benefit from sending information, without the presence of additional commercial statement in the message, is insufficient to transform a message to an advertisement." Def.'s Mot. Dismiss

6

(Advanced Dermatology), at 7 (citing *Physicians Healthsource, Inc. v. Janssen Pharms., Inc.*, 2013 U.S. Dist. LEXIS 15952, at *13 (D.N.J. Feb. 6, 2013)) (internal quotations omitted)).

Dixie counters with two different theories, one of which Advanced Dermatology also advances. Both plaintiffs contend that the faxes received satisfy the TCPA definition of an unsolicited advertisement because a fax "intending to draw the attention of the public to the desire of a defendant to enlist services to advance a commercial purpose is an 'advertisement' under the TCPA." Pl.'s Resp. Opp'n (Advanced Dermatology), at 4; Pl.'s Resp. Opp'n (Dixie), at 6-7 (arguing that a fax is an advertisement under the TCPA if it "invite[s] the recipient to 'do business with' the sender"). The plaintiffs also argue that the faxes received advertise that Fieldwork is willing and able to "***buy[]*** the time (i.e. participation) of participants"—"a direct commercial engagement that allows Fieldwork to advance its for-profit business." Pl.'s Resp. Opp'n (Advanced Dermatology), at 2 (emphasis in original).

Second, Dixie advances a pretext argument, explaining that it "expects to show that the Fax is a 'pretext' to further advertising" because Fieldwork sells the data collected to its clients; refers fax recipients to its website for more information; and informs fax recipients that market research survey participants may receive announcements about news, products, and availability of upcoming research projects in the future. Pl.'s Resp. Opp'n (Dixie), at 11. Advanced Dermatology, on the other hand, expressly disclaims the pretext theory. Pl.'s Resp. Opp'n (Advanced Dermatology), at 11 ("Advanced Dermatology makes no argument of 'pretext.' Rather, Advanced Dermatology contends that Fieldwork's facsimile, itself, directly solicits a commercial transaction—two hours of time for $450."). All parties insist that the (admittedly scattered) caselaw is on their side. The plaintiffs' theories are examined in turn.

1.  The Faxes Are Not Facially "Unsolicited Advertisements."

First, both Advanced Dermatology and Dixie Plumbing argue that the faxes the companies received are, on their face, "unsolicited advertisements" within the TCPA's definition. Each plaintiff characterizes the fax it received as one "offering a commercial exchange"—a few hundred dollars "in exchange for participation time, which [Fieldwork] sorely needed." Pl.'s Resp. Opp'n (Advanced Dermatology), at 6; *see also* Pl.'s Resp. Opp'n (Dixie), at 1 (urging that "Fieldwork's faxes propose an unequivocally 'commercial' arrangement" wherein the recipient becomes a Fieldwork independent contractor in exchange for $200 compensation per survey). And each plaintiff emphasizes that the information Fieldwork gathers through fax recipients' participation in its research surveys "is used by Fieldwork for the benefit of its clients and, ultimately, for its own profit," such that Fieldwork's faxes "promote[] a service to be bought with 'profit as an aim.'" Pl.'s Resp. Opp'n (Dixie), at 6. As a result, each argues that the fax it received is "material advertising the commercial availability or quality of any property, goods, or services" under the TCPA. 47 U.S.C. § 227(a)(5). Fieldwork maintains that "[t]he faxes . . . simply inform recipients about the survey and the compensation the recipient would receive for completing it"—it stresses that the faxes "do not contain offers to sell anything, do not promote the sale of anything, and the recipient cannot buy anything from Fieldwork." Def.'s Reply (Dixie) 2, ECF No. 40; *see also* Dixie Compl. Ex. A ("I can assure you, we are not selling anything . . . .").

Despite their insistence that the faxes are obviously advertisements within the meaning of the TCPA, however, the plaintiffs struggle to explain how the faxes they receive fit into Section 227(a)(5)'s statutory definition. Advanced Dermatology characterizes the fax as one "solicit[ing] participation in [Fieldwork's] surveys and to market its services," Advanced Dermatology Compl. at ¶ 14; as one "sell[ing] the opportunity to participate in Fieldwork surveys in exchange for which

Fieldwork pays a fee," Pl.'s Resp. Opp'n (Advanced Dermatology), at 2; as a "solicitation . . . for a commercial exchange on specified terms," *id.*; as "invit[ing] a commercial relationship for a commercial purpose on specific price terms," *id.* at 3-4; and as "offering a commercial exchange— $450 for two hours of time," *id.* at 6. Dixie Plumbing similarly describes the fax it received as "an offer by Defendants to 'buy' a service from Plaintiff and the Putative Class," Dixie Compl. at ¶ 18; as "request[ing] survey participants and offer[ing] $200 in compensation," such that it "promotes a service to be bought," Pl.'s Resp. Opp'n (Dixie), at 6; as "invit[ing] the recipient to 'do business with' the sender," *id.* at 6-7; as an "offer[] to buy the recipient's valuable time and the recipient's valuable opinions," *id.* at 7; and as "promot[ing] the commercial availability of a service, namely the service of providing opinions in exchange for $200," *id.* at 8. From these varying descriptions, two main threads of argument emerge—first, that the fax qualifies as an advertisement because it proposes a "commercial exchange" between Fieldwork and the fax recipients, and second, that the fax advertises the "service" of either providing or buying consumer opinions. Neither argument persuades the Court that the faxes constitute advertisements under § 227(a)(5).

The plaintiffs' first argument—that the fax is an advertisement because it is an invitation to its recipients to "do business with" Fieldwork—loses sight of the TCPA's statutory language in its heavy emphasis on the commercial motivation behind Fieldwork's faxes. Fieldwork's faxes that "solicit participation" in its research studies, "invite a commercial relationship," or present an opportunity to "do business" to fax recipients may be a nuisance, but to fall within the TCPA's prohibition, the fax must "advertis[e] the commercial availability or quality of any property, goods, or services." 47 U.S.C. § 227(a)(5). And in the absence of any promotion of a commercially available good or service, a mere nexus between the faxes and Fieldwork's commercial success is not enough. *See Mauthe v. Optum Inc.*, 925 F.3d 129, 133 (3d Cir. 2019) ("The TCPA only

prohibits unsolicited <u>advertisements</u>, not any and all faxes even if sent for a commercial purpose. . . . After all, a commercial entity takes almost all of its actions with a profit motivation.") (emphasis in original).

The plaintiffs' cited cases do not relax the statutory requirement that the challenged fax advertise a commercially available good or service. Dixie, for example, argues that the fax it received is plausibly an advertisement because it invites the recipient to "do business with" Fieldwork, citing *Magic, Inc. v. 127 High Street, Inc.*, No. 14 C 4344, 2014 WL 6806941, at *2 (N.D. Ill. Dec. 2, 2014), and because it is "an open invitation 'to do business with' Fieldwork," citing *Brodsky v. HumanaDental Insurance Company*, No. 10 C 3233, 2014 WL 2780089, at *7 (N.D. Ill. June 12, 2014). But in neither *Brodsky* nor *Magic, Inc.* did the court rely solely on a fax's invitation to the recipient to do business with the sender to reach the conclusion that the fax at issue was an advertisement; in *Brodsky*, the fax explicitly "discusse[d] certain products" in the company's portfolio "and the advantages and conveniences of them," 2014 WL 2780089, at *7, and in *Magic, Inc.*, the fax invited recipients to participate in "what amount[ed] to a commercial 'fax-buying' service," 2014 WL 6806941, at *2.

And here, unlike in *Brodsky* and *Magic, Inc.*, Fieldwork's goods or services are not advertised on the face of the fax itself. The fax does indicate that Fieldwork is a national market research firm; it does not, however, attempt to sell Fieldwork's market research services to fax recipients, nor does it encourage the recipients to advertise Fieldwork's market research services to others. *Compare Able Home Health, LLC v. Onsite Healthcare, Inc., S.C.*, No. 16 C 8219, 2017 WL 2152429, at *2 (N.D. Ill. May 17, 2017) (holding that a fax touting the addition of a new physician able to service the internal medicine needs of patients in the area "promotes the availability of the services of Defendant's physicians and invites new business"); *Brodsky*, 2014

WL 2780089, at *2 (fax encouraged recipient to "[h]elp your clients choose the dental and vision plan with the level of benefits that's best for their employees at little additional cost" and touting that the sender had made it easier for "them and you to do business with us"); *see also Mauthe*, 925 F.3d at 133 (acknowledging liability under the TCPA if a fax was intended to, or was at least capable of, "influencing a buyer's purchasing decision," regardless of whether buyer is fax recipient or a third party influenced by the recipient). It does not even "declare[] the commercial availability" of Fieldwork's market research services. *Cf. Mussat v. Enclarity, Inc.*, No. 16 C 07643, 2018 WL 1156200, at *4 (N.D. Ill. Mar. 5, 2018). Unlike the fax sent in *Enclarity*, the faxes received by Dixie Plumbing and Advanced Dermatology do not expressly mention Fieldwork's "clients" or describe the work that Fieldwork does for its paying customers; for recipients without a preexisting familiarity with the concept of market research, the fax does not "make clear [what] one can purchase" from Fieldwork. *Compare id.* (fax advertised that LexisNexis provides up-to-date health care provider information to its clients for a fee, and that clients use the information "for clinical summaries, prescription renewals, and other sensitive communications").

Paying more mind to the statutory language, the plaintiffs also argue that Fieldwork's willingness to pay for certain professionals' opinions, and consumers' provision of opinions in exchange for money, are "services" within the TCPA's definition. In making this argument, the plaintiffs rely heavily on *Lyngaas v. J. Reckner Assocs., Inc.*, where a district court held that a very similar fax to those at issue here—offering a $30 incentive payment to dentists who responded to a twenty-minute online survey—was an advertisement under the TCPA because the fax "call[ed] to the attention of the public the fact that the service of survey-takers is desired by the Defendant" and "communicate[d] that Defendant is seeking to employ survey-takers." No. 2:17-cv-12867-

TGB, 2018 WL 3634309, at *3 (E.D. Mich. July 31, 2018). The plaintiffs also emphasize the Sixth Circuit's holding in *Sandusky Wellness Center, LLC v. Medco Health Solutions, Inc.* that "to be an ad, the fax must promote goods or services *to be bought or sold* . . . hav[ing] profit as an aim." 788 F.3d 218, 221-22 (6th Cir. 2015) (emphasis added). Plaintiffs cite *Sandusky* and *Lyngaas* to argue that a fax may constitute an unsolicited advertisement regardless of whether "the sender of a fax is on the 'buying or selling' side of the transaction"—and urge that it then follows logically that Fieldwork's faxes "promot[ing] a service to be bought" are advertisements within the meaning of the TCPA. Pl.'s Resp. Opp'n (Advanced Dermatology), at 6; Pl.'s Resp. Opp'n (Dixie), at 6.

It is an unremarkable proposition that "any material advertising the commercial availability or quality of property, goods, or services" encompasses some faxes where the sender is not selling something. Straightforward examples include a fax advertising a service of buying unwanted goods from customers—a jewelry store that buys used gold, for example, or a junk car service—and courts in this district have adjudicated TCPA claims predicated on similar faxes. *See, e.g.*, *Magic, Inc. v. 127 High Street, Inc.*, No. 14 C 4344, 2014 WL 6806941, at *2 (N.D. Ill. Dec. 2, 2014) ("This fax invites the recipients to do business with Defendants by soliciting recipients to submit advertisements in return for a fee through what amounts to a commercial 'fax-buying' service."); *Green v. Anthony Clark Int'l Ins. Brokers, Ltd.*, No. 09 C 1541, 2009 WL 2515594 (N.D. Ill. Aug. 17, 2009) (fax advertised sender's service of connecting interested general insurance agencies looking to sell or merge their business with potential buyers). But the issue with the plaintiffs' argument is not that Fieldwork may be more appropriately characterized as participating on the buying side of the invited transaction; it's in identifying the good or service being bought or sold.

The plaintiffs argue that Fieldwork's willingness to pay fax recipients for their opinions is, itself, a commercially available service, citing the Third Circuit's recent holding in *Fischbein v. Olson Research Group, Inc.* that "an offer of payment to the recipients . . . transforms the solicitation of responses to market surveys into advertisements." 959 F.3d 559, 562 (3d Cir. 2020); *see* Pl.'s Notice of Suppl. Authority (Advanced Dermatology), ECF No. 43; Pl.'s Notice of Suppl. Authority (Dixie), ECF No. 49. The court compared a fax offering payment for survey responses to the case of a blood donor who gives blood at a blood bank in exchange for money. *Fischbein*, 959 F.3d at 563. The majority concluded that even though the act of donating blood is typically non-commercial, "it would not be a non-commercial act if the sender of the fax took steps to induce or influence the recipient by converting the donation into a commercial transaction by paying for the blood." *Id.* So, because "[a]n offer of payment in exchange for participation in a market survey is a commercial transaction," the Third Circuit reasoned, "a fax highlighting the availability of the transaction" is an advertisement for TCPA purposes. *Id.* at 562, 564.

As the dissent persuasively explained, however, the *Fischbein* majority "edits the statute to proscribe advertising 'the availability of an opportunity . . . to exchange goods or services,'" though the statutory text proscribes only the advertisement of commercially available goods or services—the *Fischbein* majority's focus on the "commercial" nature of the proposed exchange of time for money is beside the point, because the "commercial nature of a fax is only material to the extent it is connected to the availability of 'property, goods, or services.'" 959 F.3d at 565 (Jordan, J., dissenting); *see also Podiatry in Motion, Inc. v. Interviewing Servs. of America, LLC*, No. 20 C 3159, 2020 WL 5909063, at *2-3 (N.D. Ill. Oct. 5, 2020) (noting agreement with the *Fischbein* dissent's reasoning and concluding that a fax offering a $15 gift card in exchange for completing a market research study is not an advertisement within the meaning of the TCPA, because the fax

13

"is not making something commercially available; rather, it is asking for the recipient to complete a survey"). And unlike a junk car service or a jewelry store that buys unwanted gold, the purchasing of opinions is not a "service" that Fieldwork makes commercially available to the general public. Fieldwork's faxes aim to incentivize "qualified and . . . pre-screened" individuals in particular industries to participate in their market research surveys; "unlike an advertisement, the fax is not an indiscriminate, open-ended invitation" for any individual to "sell" their opinions on different consumer products to the firm. *Phillips Randolph Enters., LLC*, 526 F. Supp. 2d at 853. A fax offering an incentive for the recipient's participation in a survey is no more an advertisement than a fax informing the recipient that the sender is looking to purchase a particular consumer good, hire a babysitter or lawn care, or accept bids from contractors for a job—both types of fax undoubtedly propose a "commercial transaction,"[4] but neither advertises the "commercial availability or quality of any property, goods or services."

The plaintiffs' second argument—that Fieldwork's faxes advertised, to fax recipients, that the recipients themselves have a good (an opinion) or service (the provision of opinions in exchange for money) that Fieldwork was interested in purchasing—turns the TCPA's definition of "unsolicited advertisement" on its head. Dixie insists that the TCPA's definition of an unsolicited advertisement does not limit prohibited faxes "to material advertising '*the sender's* property, goods, or services.'" Pl.'s Resp. Opp'n (Dixie), at 6. But the FCC's implementing regulations do support such a limitation—in the regulations, the term "sender" is defined as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or *whose goods or*

---

[4] Defined by the *Fischbein* majority, with reference to Encyclopedia Britannica, as transactions that "serve to transmit economic values such as materials, products, and services from those who want to exchange them for another value, usually money, to those who need them and are willing to pay a countervalue." 959 F.3d at 562-63.

*services are advertised or promoted* in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(11) (emphasis added); *see also Helping Hand Caregivers, Ltd. v. Darden Rests., Inc.*, 900 F.3d 884, 888-89 (7th Cir. 2018) (rejecting a strict liability approach to determining which entities are "senders" under the FCC's regulation, and holding that agency rules should be applied to determine whether an advertisement promoting an entity's goods or services was sent on behalf of a principal). Using the plaintiffs' logic, Advanced Dermatology or Dixie could ostensibly be treated as the "sender" of the fax because Fieldwork was promoting the plaintiffs' own good or service—an opinion itself, or the act of providing opinions in return for pay. The statute cannot be read to permit such an illogical outcome.

In sum, the faxes received by Advanced Dermatology and Dixie are not facially advertisements within the meaning of the TCPA—though the faxes do invite recipients to engage in a "commercial exchange" of time for money, neither fax advertises the commercial availability or quality of a good or service.

> ### 2. Dixie Plumbing Has Plausibly Pleaded the Fax Is a Pretext to Further Advertising.

Dixie advances a second theory as to how Fieldwork violated the statute, namely that the fax it received was a pretext to further advertisement of Fieldwork's market research services or the products its market research involves. "Courts have . . . held that a fax need not explicitly mention a commercially available product or service, or express an intent by the defendant to market its products or services if the fax was a 'pretext' to marketing the defendant's goods and services." *Enclarity, Inc.*, 2018 WL 1156200, at *3; *Mussat v. IQVIA, Inc.*, No. 17 C 08841, 2018 WL 8898647, at *3 (N.D. Ill. June 6, 2018) (denying motion to dismiss because the complaint went beyond mere "conclusory allegations that the defendant derived economic benefit from the fax" and "plausibly alleges facts suggesting that the fax—although not an overt sales pitch—

furthered the Defendant's commercial efforts or advanced its marketing operations") (internal quotations omitted); *see also In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 21 FCC Rcd. 3787, 3815 (2006) ("Finally, we conclude that any surveys that serve as a pretext to an advertisement are subject to the TCPA's facsimile advertising rules. The TCPA's definition of an 'unsolicited advertisement' applies to any communication that advertises the commercial availability or quality of property, goods or services, even if the message purports to be conducting a survey."). This is because faxes promoting free goods or services (or, as in this case, offering to pay the fax recipient for their time) "are often part of an overall marketing campaign to sell property, goods, or services," 21 FCC Rcd. at 3814—the initial fax serves to get the sender's foot in the door with a potential consumer and establish a (potentially profitable) relationship for the future. And "[a]t the motion to dismiss stage, plausible allegations that the fax was used to further the defendant's commercial efforts or advance its marketing operations may suffice to state a claim that the fax was a pretext to an advertisement." *Enclarity, Inc.*, 2018 WL 1156200, at *3.

Though its briefing is somewhat perfunctory on this point, Dixie plausibly alleges that Fieldwork's fax was a pretext to further advertisement. In support of its pretext argument, Dixie highlights both that Fieldwork sells the data collected during its market research surveys to its clients and that the fax directs recipients to Fieldwork's website. Pl.'s Resp. Opp'n (Dixie), at 11-12. Dixie also notes that the privacy policy on Fieldwork's website states that by entering into an "Independent Contractor relationship" with Fieldwork (through participating in one of its market research studies), an independent contractor agrees that Fieldwork may send announcements "of the latest news, products, and availability of upcoming research products" and refers to these as "marketing or promotional materials." *Id.* The privacy policy does not make clear whether the

16

products marketed are Fieldwork's market research services or Fieldwork's clients' consumer goods; if the fax was used as a pretext to further either type of promotion, however, it could plausibly violate the TCPA. *Compare Enclarity, Inc.*, 2018 WL 1156200, at *4 (concluding it was at least plausible that the form faxes were part of the sender's marketing operations to get fax recipients to traffic the sender's website, where its products and services were advertised). And though Dixie does not address it in its briefing, the fax could plausibly be a pretext for advertising in the promoted market research survey itself— the fax indicates that the survey focuses on "brands and products [residential plumbers] purchase" and use, and that the survey is an opportunity "to give input into the development of new products and ideas." Dixie Compl. Ex. A.

Because Advanced Dermatology expressly waives its reliance the pretext theory, however, *see* Pl.'s Resp. Opp'n (Advanced Dermatology), at 11, the Court arrives at a somewhat curious result—Fieldwork's motion to dismiss for failure to state a claim is granted as to Advanced Dermatology, but denied as to Dixie Plumbing, though the faxes the two plaintiffs received are substantively nearly identical. But just as it is "not the obligation of this court to research and construct the legal arguments open to the parties," *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006), it is not the Court's prerogative to disregard a party's waiver of what has, upon the Court's consideration, turned out to be a meritorious argument, particularly when that party is represented by counsel. Fieldwork's remaining motions as to Advanced Dermatology are therefore denied as moot. Because Dixie Plumbing's complaint survives Fieldwork's motion to dismiss for failure to state a claim, however, Fieldwork's motions to strike and to stay must be addressed.

### B. Motion to Strike the Plaintiffs' Class Allegations.

Alternatively, Fieldwork argues that the plaintiffs' class allegations should be stricken because the plaintiffs' proposed class definitions describe non-certifiable fail-safe classes.[5] Rule 23 requires any class to satisfy numerosity, commonality, typicality, and adequacy requirements. Fed. R. Civ. P. 23. It also requires that a proposed class be ascertainable, *i.e.*, defined clearly and based on objective criteria. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). If these criteria are not satisfied, the proposed class cannot be certified, and "[t]he interplay of Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) empowers the Court to dismiss or strike class allegations at the pleading stage." *Murdock-Alexander v. TempsNow Employ't*, No. 16 C 5182, 2016 WL 6833961, at *3 (N.D. Ill. Nov. 21, 2016), *citing Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). A court may do so even in the absence of a motion seeking class certification; the court "need not

---

[5] In its complaint, Advanced Dermatology defined the relevant class as follows:

> All persons in the United States who received a facsimile from or on behalf of Defendants and who had no ongoing business relationship with Defendant and had not given consent to receive facsimiles from defendant or where the facsimiles did not provide optout language, within the four years prior to the filing of the Complaint until the class is certified.

Advanced Dermatology Compl. at ¶ 18.

Dixie offered the following class definition:

> All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability or quality of any property, goods, or services by or on behalf of Defendant, (3) from whom Defendant did not obtain "prior express invitation or permission" to send fax advertisements, or (4) with whom Defendant did not have an established business relationship, and (5) where the fax advertisements did not include an opt-out notice complaint with 47 C.F.R. § 64.1200(a)(4)(iii).

Dixie Compl. at ¶ 23.

delay a ruling on certification if it thinks that additional discovery would not be useful in resolving the class determination." *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011). However, a court should strike class allegations at the pleading stage "only where the pleadings are facially defective or inherently deficient," and, where the plaintiff has not yet had the benefit of class discovery, the defendant "bears the burden of proving that the proposed class is not certifiable." *Dowding v. Nationwide Mut. Ins. Co.*, 490 F. Supp. 3d 1291, 1298 (N.D. Ill. 2020). And it is an "exceptional case" where the complaint is "so facially lacking that no amount of discovery or time could provide support for class status" so as to warrant striking the class allegations and "conserv[ing] court and party resources." *Jones v. BRG Sports, Inc.*, No. 18 C 7250, 2019 WL 3554374, at *3-4 (N.D. Ill. Aug. 1, 2019); *see also Murdock-Alexander*, 2016 WL 6833961, at *4 ("Striking class allegations at the pleading stage is generally inappropriate.").

Fieldwork may well be correct that, if certified as written, Dixie's proposed class definition would create a fail-safe class. A fail-safe class "is defined so that whether a person qualifies as a [class] member depends on whether the person has a valid claim"; these types of class definitions are impermissible under Rule 23 "because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 799-800 (7th Cir. 2017) (internal quotations and citation omitted). Fieldwork likens the plaintiffs' proposed class definitions to the definition modified by the court in *Alpha Tech Pet, Inc. v. Lagasse, LLC*, 205 F. Supp. 3d 970, 976-99 (N.D. Ill. 2016), and argues that, as in *Alpha Tech*, the plaintiffs' proposed classes are defined by legal parameters taken directly from the TCPA's statutory language and should be stricken in their entirety. *Compare Alpha Tech*, 205 F. Supp. at 977-78 (defining class with reference to "prior express permission" and "opt-out

notice"), *with, e.g.*, Dixie Compl. at ¶ 23 (defining class, in part, as persons who received a fax without a "proper opt-out notice" that complied with 47 C.F.R. § 64.1200(a)(4)(iii)).

But even if Dixie's proposed class definition would flunk Rule 23's ascertainability requirement as written, striking its class allegations is not the appropriate solution. The *Alpha Tech* court, itself, made that clear. Rather than granting the defendant's motion to strike, the court made minor modifications to the plaintiff's proposed class definition as a stop-gap measure, explaining that the court's definition "will suffice for the time being" until the plaintiff amended and further refined the class definition through further discovery. *See* 205 F. Supp. 3d at 978-79. Addressing head-on the defendant's contention that the class definition's flaw "requires it to be stricken and Alpha Tech's motion for class definition to be denied," the court observed that definitional problems "can and often should be resolved by refining the class definition rather than by flatly denying class certification on that basis," particularly where the challenge to the class definition is made at the pleading stage. *Id.* at 978 n.7 (citation omitted); *see also Chapman v. First Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015) (noting that the plaintiff's complaint is not even required to include a class definition).

Tellingly, Fieldwork has not argued that Dixie is categorically unable to meet Rule 23's numerosity, commonality, typicality, or adequacy requirements, such that class discovery would be unnecessary or a waste of party and judicial resources. And that's unlikely to be true—as the plaintiffs note, "[c]lass certification is normal in litigation in § 227, because the main questions, such as whether a given fax is an advertisement, are common to all recipients." *Holtzmann v. Turza*, 728 F.3d 682, 684 (7th Cir. 2003). Because Fieldwork has not borne its burden of showing that Dixie brings the "exceptional case" where striking class allegations at the pleadings stage,

before the plaintiff has a chance to engage in discovery, is appropriate, Fieldwork's motion to strike is also denied.

### C.  Motion to Stay or Dismiss Pursuant to the Primary Jurisdiction Doctrine.

Finally, Fieldwork urges this Court to dismiss or stay the proceedings pursuant to the primary jurisdiction doctrine, citing a petition pending before the FCC asking for guidance on whether faxes alerting recipients to market research opportunities constitute advertisements under the TCPA. In 2017, M3 United States Corporation, a market research firm, asked the FCC to declare that "[i]nvitations to participate in market research surveys are not advertisements under the TCPA unless commercially-available property, goods or services are promoted in the fax itself or during the survey itself" and that "[m]arket research surveys do not constitute property, goods or services vis-à-vis the persons taking the surveys under the TCPA." *See* Def.'s Mot. Dismiss or Stay (Advanced Dermatology), at 5. The agency engaged in a round of notice and comment on how the agency should define "advertisement" in the fax context but has taken no further action since the comment period closed in May 2017. *See* Dixie's Resp. Opp'n Stay at 5-6 (FCC initially sought comments on M3 petition on March 28, 2017; comments were due April 27, 2017; and reply comments were due May 15, 2017).

The Court has inherent power to control its docket; incidental to its power to "control the disposition of the causes on its docket with economy of time and effort" is the power to stay proceedings. *Fauley v. Heska Corp.*, 112 F. Supp. 3d 775, 779 (N.D. Ill. 2015). The primary jurisdiction doctrine "comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body"—in such circumstances, a court has the authority to suspend the judicial process "pending referral of such issue to the administrative body for its views." *Ill. Bell Tel. Co.,*

*Inc. v. Global NAPs Illinois, Inc.*, 551 F.3d 587, 594 (7th Cir. 2008) (citations omitted); *see also Arsberry v. Illinois*, 244 F.3d 558, 563-64 (7th Cir. 2001) (defining the doctrine as one that "allows a court to refer an issue to an agency that knows more about the issue, even if the agency hasn't been given exclusive jurisdiction to resolve it"). There is "no fixed formula for the invocation of the doctrine" and the decision whether to apply it depends on considerations of consistency, uniformity, unique agency expertise in technically complex areas, and judicial economy. *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991); *see also Chavez v. Church & Dwight Co., Inc.*, No. 17 C 1948, 2018 WL 2238191, at *8 (N.D. Ill. May 16, 2018). Fieldwork contends that each factor weighs in favor of a stay or dismissal in this case. *See, e.g.*, Def.'s Mot. Dismiss or Stay (Dixie), at 8.

Fieldwork first requests that the plaintiffs' cases be dismissed altogether. As the Seventh Circuit has noted, there are two different concepts embodied in the primary jurisdiction doctrine: first, what was previously known as "exclusive agency jurisdiction," where a court must stop a case if an issue arises that is within the exclusive original jurisdiction of a regulatory agency to resolve; and second, a weaker version, where the court has either exclusive or concurrent jurisdiction with the agency to decide an issue but nonetheless seeks the agency's advice or input. *Arsberry*, 244 F.3d at 563-64 (at the "core" of the weaker version is the idea that "the court has jurisdiction of the *case*, but the agency of the *issue*"). Fieldwork does not argue that the first version of the doctrine is at play here such that this court cannot retain jurisdiction, nor does it offer any argument as to why dismissal is the best course of action. *See, e.g.*, Def.'s Mot. Dismiss (Advanced Dermatology), at 4-6 (noting only that courts *may* dismiss or stay pursuant to the primary jurisdiction doctrine); *see also AT&T Corp. v. Ameritech Corp.*, No. 98 C 2993, 1998 WL 325242, at *7 (N.D. Ill. June 10, 1998) ("If the parties would not be unfairly disadvantaged, the court may

also dismiss the case without prejudice."). In the absence of assurances that Dixie will not be prejudiced by a delay, "a stay is preferable over a dismissal, even a dismissal without prejudice," because a dismissal creates the risk that the plaintiff will be time-barred from reinstating its suit after a potentially lengthy period of agency review. *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 132 n.2 (7th Cir. 1991); *see also* Dixie's Resp. Opp'n Stay 5, ECF No. 38 (if the case is dismissed, "Fieldwork need only hope that there is no resolution on the M3 petition until May 22, 2023" because "[a]fter that date, the statute of limitations will have expired on Plaintiff's individual claims" and claims of proposed class members).

Dixie advances two main arguments against even staying its case: first, that the FCC petition has been pending since 2017, and there is no indication that the FCC will take action on it in the near future; and second, that the Court can adjudicate for itself whether the faxes the plaintiffs received are "advertisements" within the TCPA independently of the outcome of that petition—Dixie argues that final FCC guidance on the issue would be persuasive, but not binding, authority for this Court to take into consideration. *See generally* Dixie's Resp. Opp'n Stay.

The latter argument—that it is unclear whether the FCC's resolution of the pending petition will be binding on this Court—is not determinative. On remand from the Supreme Court, the Fourth Circuit recently explained that whether the FCC's construction of the TCPA is binding on district courts depends on whether the FCC rule at issue is interpretive or legislative. *See Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 263-64 (4th Cir. 2020). Interpretive rules are those "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Id.* at 263. Agencies do not need to go through the notice and rule making process before issuing interpretive rules; the tradeoff for this "convenience of having to jump through fewer procedural hoops to issue agency guidance," however, is that

such rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Id.* at 263-64; *see also PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019). Legislative rules, on the other hand, are "issued by an agency pursuant to statutory authority" and have the "force and effect of law." *PDR Network, LLC*, 139 S. Ct. at 2055. To wield its legislative authority, agencies must engage in the notice and comment process. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (describing three-step notice and comment rulemaking process).

The parties do not robustly address the issue of whether an FCC declaratory ruling, like that at issue here, is legislative or interpretive. That the agency engaged in a notice and comment process in 2017 suggests that the FCC intends its decision on the petition to be legislative. But the Seventh Circuit has explained that even where an agency "promulgate[s] its policy through individual adjudicative proceedings rather than rulemaking," an "agent's interpretation of a statute it administers commands deference." *City of Chicago v. FCC*, 199 F.3d 424, 429 (7th Cir. 1999) (and noting that *Chevron* deference has been applied to adjudicative proceedings). Accordingly, the FCC guidance will very likely be owed some level of deference after it is finalized, regardless of its legislative or interpretive status.

But the uncertainty about *when* the FCC will issue its guidance, be it legislative or interpretive, weighs heavily against staying these proceedings. Even if the agency acted soon and promulgated guidance that would govern the analysis in this case, the FCC's decision could be appealed through an "application for review" to the full Commission and then to judicial review under the Hobbs Act. Dixie's Resp. Opp'n at 6. Dixie highlights several instances where the entire process, from the filing of the petition to a final resolution, took six or seven years—if that timeline holds for this petition, there may not be a final answer from the FCC on the issues presented until

24

2023 or 2024. Because there is "no indication of when, if ever, the [FCC] will act," and because there is "no guarantee that [the FCC's resolution of the pending petition] would squarely address the issues raised in this litigation," there is no good basis for protracting this litigation, particularly given the likely prejudice to the plaintiff of a prolonged stay. *Chavez*, 2018 WL 2238191, at *8.

*    *    *

For the foregoing reasons, Fieldwork's motion to dismiss Advanced Dermatology's complaint for failure to state a claim [9] is granted and as the dismissal is based on its waiver, rather than any pleading deficiency, the dismissal is with prejudice. Fieldworks' motions to strike Advanced Dermatology's class allegations [9] and to stay or dismiss pursuant to the primary jurisdiction doctrine [11] are denied as moot. Fieldwork's motion to dismiss Dixie Plumbing's complaint [16], on the other hand, is denied, as are its motions to strike [16] and to stay or dismiss [17].

Dated: July 21, 2021

John J. Tharp, Jr.
United States District Judge